Filed 6/8/23 In re Robert H. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Robert H. et al., Persons Coming Under the Juvenile Court Law. | B324774 |
| | Los Angeles County Super. Ct. Nos. 19CCJP04692A, 19CCJP04692B |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.D., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Stephen C. Marpet, Judge Pro Tempore of the Juvenile Court. Conditionally affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

———————

Mother and father separately appeal the juvenile court's orders terminating their parental rights to their son Robert (born December 2012) and daughter R.H. (born May 2019). Mother contends the juvenile court erred in finding the beneficial parent relationship exception to adoption did not apply under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). She also contends the court and the Los Angeles County Department of Children and Family Services (DCFS) failed to make an adequate inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law (Welf. & Inst. Code, § 224 et seq.).[1] Father joins in mother's arguments.[2] We

———————

[1] Undesignated statutory references are to the Welfare and Institutions Code. Because ICWA uses the term "Indian," we do the same for consistency, although we recognize other terms are preferred. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

[2] Father's notice of appeal indicates he challenged the court's denial of his section 388 petition, heard September 22, 2022 and October 6, 2022, and the court's October 17, 2022 orders terminating his parental rights. Father' opening brief includes statements of the case and facts, but he merely joins in mother's arguments and makes no substantive arguments of his own. He thus has forfeited any claim of error as to the court's denial of his section 388 petition and the applicability of the beneficial parent relationship exception as to him. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1154, fn. 9.) Accordingly, we address only

conclude substantial evidence supports the juvenile court's finding that the beneficial parent relationship exception to adoption did not apply. As DCFS does not oppose a remand for it to make an ICWA inquiry of the children's known and available extended family members, we conditionally affirm the order terminating parental rights and remand the matter for DCFS to do so.

## FACTUAL AND PROCEDURAL BACKGROUND

A detailed account of the juvenile court proceedings through its August 4, 2020 orders sustaining DCFS's section 387 supplemental petition and removing the children from parents' custody is set forth in this Court's earlier opinion affirming the court's disposition orders (*In re Robert H.* (Feb. 25, 2021, B307041) [nonpub. opn.]). We summarize the pertinent events, drawing on our earlier opinion.

### 1. *Earlier proceedings leading to removal of children*

In July 2019, DCFS filed a non-detained section 300 petition in the juvenile court under subdivision (b)(1) alleging the children's physical health and safety were at serious risk of harm due to parents' daily marijuana use, which interfered with their ability to care for and supervise their children.[3] At the detention hearing, the court found there were reasonable services to prevent detention, and released the children to parents under DCFS's supervision.

---

the applicability of the exception to mother and focus on the facts relevant to her.

[3] We state the allegations as amended by the juvenile court.

DCFS's investigation revealed both parents had a long history of marijuana use. Robert suffered from asthma and had missed numerous days from school because of it. DCFS gave parents a referral for the mobile pediatric asthma program. Parents also required new housing due to issues with their landlord. They planned to move in with paternal great-grandmother.

In October 2019, parents pleaded no contest to the amended petition. The juvenile court declared the children dependents of the court, found reasonable services available to prevent their removal, and released them to parents' home. The court ordered mother to participate in random drug testing, individual counseling, and a parenting course.[4] Mother no longer would be required to drug test if she submitted six consecutive clean tests.

At the January 22, 2020 non-appearance progress report hearing, DCFS submitted its last minute information report (LMI) stating it had "unresolved safety and overall well-being concerns for minors." Mother (and father) had failed to submit to drug testing and had not enrolled in any services. As of November 2019, Robert had missed 21 days of school since September. Mother had received a notice of eviction and notice to vacate the family home. She nevertheless declined the social worker's offer to refer her to transitional and sober living housing and had yet to contact Legal Aid for assistance. DCFS opined parents were not "seriously focusing on complying with the Court orders." The juvenile court found parents not in compliance with

---

[4]    The court made similar orders as to father.

4

their case plans, ordered family preservation services, and set an appearance progress hearing for February 27, 2020.

In its LMI filed for the February hearing, DCFS reported mother still had not submitted any drug tests. During an unannounced visit in early February, the social worker smelled marijuana in the air while mother held R.H. As of February 12, 2020, a psychiatric social worker with the Department of Mental Health had been unable to reach mother by phone or mail to schedule a mental health treatment plan appointment for Robert. The agency thus closed the referral. At the February 27 hearing, the court admonished parents to cooperate with its orders and to meet their children's needs, including Robert's asthma and education needs.

At some point in March 2020, mother and the children moved into the home of father and paternal great-grandmother. During a virtual home inspection in April 2020 (due to COVID-19 restrictions), Robert told the social worker he "feels better with no breathing problems." Both he and R.H. appeared to be happy and healthy. Mother still had not submitted to drug testing and admitted she had not followed up with medical appointments for either child.

DCFS detained the children from parents on April 24, 2020, and placed them with maternal aunt and her wife. On April 28, 2020, DCFS filed a supplemental petition under section 387 alleging parents' failure to comply with their court-ordered case plans endangered the children's physical health and safety and placed them at risk of harm.

In its LMI filed for the May 1, 2020 detention hearing, DCFS reported Robert had disclosed paternal great-grandmother had hit him on his limbs and stomach while the family was living

5

with her; mother had hit him with a belt; and paternal great-grandmother "smoke[d] constantly while in the home." The court detained the children and ordered twice weekly monitored visits for parents.

The jurisdiction/disposition report updated the court on the family's circumstances. DCFS had given mother drug testing information on May 11, 2020, but she admitted she had been smoking and asked the social worker to "hold off" on submitting the testing referral. In a July 1, 2020 interview, Robert told the social worker he liked staying with his aunt. He was participating in on-line schoolwork but had difficulty with reading. He had a cell phone to call his mother. Maternal aunt was concerned about Robert's mental health, anger, and behavior.

On August 4, 2020, after hearing argument, the juvenile court sustained the supplemental petition, vacated its prior home of a parent order, removed the children, and ordered the children suitably placed with maternal aunt. The court ordered DCFS to provide family reunification services; mother to submit to drug testing, a parenting education program, and individual counseling; and monitored visitation twice a week for two hours each visit. This court affirmed those orders.

2.    *Family reunification (August 2020 to September 2021)*

DCFS's status review report filed October 22, 2020 noted the children continued to live with maternal aunt, her wife, and her wife's daughter. They were providing a clean, safe, and loving home for the children. Robert had begun mental health therapy that month and was attending online classes as a second-grader.

Parents were living with paternal great-grandmother. (Mother lived in the garage when father was away.) In July 2020, mother had enrolled in an affiliate of "Shields for Families" and received parenting, case management, and housing referrals. Mother had not returned to the agency since enrolling, however. She apparently was receiving therapy through another agency, but the social worker could not confirm if that were true. Mother was visiting the children at maternal grandmother's home. Father refused to visit and had had no contact with the social worker since the children's removal.

In its report filed January 6, 2021, DCFS noted the social worker visited the children's caretakers in December 2020. The caretakers wanted mother to put more effort into seeing her children. On the weekends, they drove the children to maternal grandmother's home to visit mother. They had asked mother to pick a weekday when she could take the bus to visit the children at their home as well, but she had not responded. The aunts were providing the children with everything they needed and were willing to be their co-guardians. DCFS recommended the court terminate reunification services.

At the February 2, 2021 review hearing, the court found parents' progress toward alleviating or mitigating the circumstances necessitating the children's placement had "not been substantial." Nevertheless, the court continued reunification services.

In its LMI filed April 20, 2021, DCFS noted mother reported she was almost done with her parenting class and had enrolled in individual counseling, but the social worker was unable to verify that information with mother's providers. Mother also told the social worker she would be having surgery

in a few days.  The children had adjusted well to living with maternal aunt; they were happy and stable.

DCFS's status review report filed July 23, 2021 noted mother had been partially compliant in her case plan.  Mother asked to defer drug testing until after her surgery, however, as she would be taking medication.  She then had complications from the surgery, apparently preventing her from testing.  Mother said she had to reenroll in the parenting class through Shields for Families due to her surgery.  In July 2021, mother's therapist from Shields for Families confirmed mother had enrolled in therapy last year.  Mother had been "doing pretty well" and had missed sessions only occasionally, the last time having been due to her surgery in April.

Visits were scheduled for twice a week, once at maternal grandmother's home and once at maternal aunt's home.  Father did not come to the visits.  Mother video-called father during her visits, so he could see the children.  In June 2021, maternal grandmother told the social worker mother was required to confirm the visit in advance with maternal aunt or the visit wouldn't take place.  There had been times when mother hadn't shown up for a visit after maternal aunt had driven the children to maternal grandmother's home.  Maternal grandmother also said mother had shown up to a few visits after she had been drinking or smoking marijuana and sometimes arrived late.  According to maternal grandmother, mother sometimes yelled at R.H. and didn't have the patience to care for her during visits.

DCFS described Robert and R.H. as "doing very well."  To accommodate the two children, their caregivers had moved from their two-bedroom apartment to a larger, three-bedroom unit.  Maternal aunt and her wife were willing to be co-guardians of

the children. Robert said, " 'I want to stay with my aunt. I don't want to go with my dad, but I wouldn't mind seeing my mom.' "

DCFS again recommended the court terminate parents' reunification services. The court continued the review hearing to September 24, 2021 for the parents to contest that recommendation.

At the hearing, counsel for DCFS told the court DCFS now recommended continuing reunification services due to the COVID-19 pandemic and mother's inability to test because of her surgery. The court disagreed. Noting the children had been detained 17 months earlier, and parents thus would be entitled only to one more month of services, the court stated it could not find there was a likelihood of reunification in the next month. The court stated parents had "done nothing," had not shown the court they wanted their children "back in their life," and had "stagnated for a year and a half." The court found it "patently obvious . . . that services should be terminated today." The court terminated reunification services over DCFS's objection and ordered a section 366.26 hearing.

3.     *Permanency planning (October 2021 to October 2022)*

In January 2022, DCFS filed section 366.26, status review, and addendum reports. Mother continued to have monitored visits with the children on Sundays at maternal grandmother's home. She did not attend her second scheduled weekly visit at the caregiver's home. Father had not confirmed a day for his monitored visits, but in late December the social worker and he had discussed it, and father was to get back to her after the new year.

The children were "comfortable and thriving" in maternal aunt's home. R.H. had started school and Robert was "doing

9

pretty well in school."  DCFS repeated Robert's earlier statement about wanting to stay with his aunt.

Maternal aunt and her wife wanted to adopt the children. They "wish[ed] to provide a nurturing and stable home" for Robert and R.H.  DCFS noted maternal aunt had been involved in the children's lives since their birth.  DCFS identified adoption as the most appropriate plan, but the adoption study was not yet complete due to maternal aunt and her wife having relocated to the larger home.  They were raising their two children— a 12-year-old daughter and a baby born July 2021—along with Robert and R.H.  They both worked full-time and shared childcare responsibilities.  DCFS noted the children interchangeably referred to maternal aunt and her wife as " 'aunt' and 'mom.' "

DCFS reported Robert's statements about adoption as: wishing "to live with his 'aunties' until he is older,' " sometimes calling them " 'mom,' " and being happy living with his aunts, their children, and R.H.  R.H. was too young to make "a meaningful statement regarding adoption," but DCFS noted she had "been observed being comfortable and playful in the presence" of her caregivers.

In January 2022, father filed a section 388 petition to reinstate his family reunification services and for unmonitored and extended visits.  Father had enrolled in services and was testing negative.  He stated he had a strong bond with his children based on their virtual visits each Sunday.  The court summarily denied the petition as failing to state new evidence or a change in circumstances.

In its section 366.26 and status review reports filed April 18, 2022, DCFS stated adoption remained the permanent

10

placement goal for the children and recommended the court terminate parental rights. DCFS noted the children continued to do well in the caregivers' home. Robert had begun to have some behavioral issues, however. He wasn't listening at school or at home, and sometimes yelled in class. The social worker referred Robert to therapy.

On May 17, 2022, father filed a second section 388 petition, asking for the same change in orders as before, noting he had completed his drug treatment program and various classes, and was regularly participating in counseling.

DCFS's LMI filed the day before the May 20, 2022 hearing reported the prospective adoptive parents' new home had been approved and there were no impediments to adoption readiness. At the hearing, counsel and the court discussed issues with the notice of the section 366.26 hearing. Minors' counsel also objected to the section 366.26 report as having insufficient information regarding the quality of visitation; counsel asked for the report to provide that information. She had asked DCFS in January to provide more information on the quality of parents' visits with the children. The court set father's section 388 petition for hearing in July with the 366.26 hearing to trail. The court ordered DCFS to provide parents with proper notice and admonished it that the 366.26 report "needs to give me an update how the visits are going, when it's going, and the dates, times, location so that I can make appropriate findings."

The section 366.26 and status review reports filed July 14, 2022 made no change in recommendation. As of June 15, 2022, father had not had any visits or calls with the children, and the caregiver stated the children did not have a relationship with him. According to the caregiver, mother continued to visit the

11

children on Sundays at maternal grandmother's home but showed "little to no pat[ience] with the children and g[ot] easily frustrated with them." DCFS recommended the court deny father's petition and proceed with termination of parental rights.

The court set father's section 388 petition for a contested hearing in September and continued the section 366.26 hearing for the same day. At minors' counsel's request, the court ordered DCFS to provide delivered service logs to all counsel.

DCFS provided delivered service logs from May 20, 2022 to August 9, 2022. On June 16, 2022, the caregiver told the social worker mother visited every Sunday but was "very impatient with the kids" and "easily frustrated." When the social worker asked Robert where he wanted to live, he said he wanted "to continue to be with his aunt." On August 3, 2022, the social worker contacted father about re-establishing his visits.

In its addendum report filed August 12, 2022, DCFS noted the social worker had been in contact with father about setting his visitation for two weekday evenings and was waiting for his response. The report noted Robert said he does not want to live with father and "continues to voice that he wants to be adopted by maternal aunt." The caregiver told the social worker that Robert had been acting out and becoming defiant. Robert shared with the caregiver that he acted out because people had told him he was "going to live with his dad and he does not want that to happen." The report also revealed a domestic violence incident had occurred between parents in October 2021.

The court continued the hearing to September 22, 2022. The hearing on father's section 388 petition proceeded over two days, September 22 and October 6. Father and the supervising social worker testified, primarily about father's visitation.

DCFS provided an LMI to the court with updated information for the October 6, 2022 hearing. The court had ordered it to provide a report "detailing/itemizing the parents['] visitation with the children from at least the last 3 to 4 months." The new social worker assigned August 19, 2022 interviewed Robert at school on September 27, 2022. She asked Robert about his recent September visits with father. Robert, who now saw his father on Wednesdays and Saturdays, said the visits were "new to him," as " 'before [he] wouldn't see him and it had been a very long time since [he] saw [his] dad.' "

Robert also talked about his visits with mother. He saw mother at his grandmother's every Sunday, and said he had a better relationship with her than with father. He said he "really enjoys being able to hug his mom." They usually eat at his grandmother's and play and watch television together. Sometimes they walk to the park. When asked about phone calls with mother, Robert said he sometimes asks "his auntie to call mom." He said "he would actually like to visit mom more."

Robert did not understand why this was happening to him. He said he asked his auntie why he was taken from his parents, and she said it was because he was left alone at home. Robert explained he didn't remember ever being left alone, stating, " 'All I would do was go to school and be with my mom.' " He described mother walking him to the corner and waving "bye" after he crossed the street to enter the school.

The social worker also asked Robert if he knew what "being adopted" meant. Robert responded that it meant "not being a part of his mom anymore." When asked if he wanted to be adopted, Robert stated he wasn't sure. He said "that is a question that he asks himself." When asked if would like to be

returned to his parents' care, Robert said he "did not know if he wanted that." The social worker then asked Robert if would like his aunt to adopt him, and he said, " 'Yes, I would like to be adopted by my aunt as long as I can still have visits with my mom and dad.' " He said "he would be very upset if he did not see his mom because he enjoys hugging her a lot and has a good relationship with his mom."

The social worker interviewed mother and father separately that same day. Mother said she visits the children on Sundays and calls them about once a week. When asked why she didn't also visit on Saturdays, mother responded she didn't know that was an option. Mother said she and the children play games at maternal grandmother's home and sometimes go to the park. Mother said she sometimes brings toys and food for the children during her visits. She described R.H. as crying when she leaves, but mother said R.H. would stop if she gave R.H. money. Mother said she never had alone time with the children, as someone always was present. The social worker explained monitored visits required the monitor to be "within ear and eye shot."

Mother said she and father were living in paternal grandmother's home with his sister. Mother received state disability income due to a learning disability. She told the social worker she had completed the required six clean tests and was getting ready "to do parenting" with Shields for Families, where she goes for counseling.

Mother was against adoption. She said that "given it's her sister, and she'll be able to still see her children, she guess[es] it's okay, but she would like to be more involved with the decision making, like parties, etc."

14

The social worker also interviewed father. He told her that before she scheduled his first visit on September 17, he hadn't had a set visitation schedule. Father stated the former social worker did not help him arrange visitation. Rather, he had video calls with the children on mother's phone when she visited them on Sundays.

The social worker spoke with the caregiver by phone about parents' visits. She said the social worker tried to arrange visitation for father in the past, but he would never follow through. He also never called to check on the children. The caretaker described father's recent visits at parks near his home and near the caretaker's home.

The caregiver confirmed mother consistently visited the children on Sundays, usually at maternal grandmother's home. The caregiver said the previous social worker had arranged for mother to visit once during the week but "that has never happened." Rather, mother visited only when the caretaker drove the children to maternal grandmother's home in Los Angeles. The caregiver said mother usually watched television with the children or would give them her cellphone. Sometimes they walked to the park, but mother wouldn't bring anything to play with the children there. Rather, she would just sit there and not engage with the children. As for calls, the caregiver said mother called only to confirm her visit on Sundays; she did not otherwise call to check on the children's wellbeing.

The caregiver told the social worker she was willing to have an open adoption if the children wanted to visit mother and father. The report recommended the court terminate parental rights and the children be placed for adoption. The report noted that, "[i]f the children were to be adopted, there is not

15

a detriment in attachment with [mother or father] as caregiver, [maternal aunt] is open to having an open adoption and allow the children to have ongoing visits with their biological parents."

### 4. *Final section 366.26 hearing*

The court convened the section 366.26 hearing on October 17, 2022. Mother was not present. Father testified about his difficulties with the former social worker in arranging visitation, and his interactions with the children. The court noted the former social worker stated in her reports that she had contacted father about visitation dates, but he never followed-up with her. Father's counsel argued the children would benefit from a relationship with him.

Mother's counsel joined in father's argument. She asked the court to find the beneficial parent exception applied and to order legal guardianship as the children's permanent plan. Mother consistently visited and called the children every week. Counsel also noted Robert had said he enjoys being able to spend time with parents, hug mother, and go to the park with mother and engage in activities with her. Counsel argued those activities were "typical for a parent and child to do to bond." Robert also said he would like to see mother more often and had a good relationship with her, demonstrating his strong bond with mother. He wanted to be adopted by his aunt as long as he still could visit parents. Counsel argued Robert "is clearly telling us that he does not approve of nor does he want an adoption as that would potentially sever the relationship between . . . him and his parents."

Minors' counsel acknowledged mother had a better argument than father, as she did visit consistently and arguably had a beneficial relationship with the children, though not

16

necessarily in the role of a mother. Assuming mother had a beneficial relationship with the children, counsel argued that relationship did not outweigh the benefits of adoption. Counsel noted the children had been with maternal aunt for two and a half years and had a very strong connection to her. Minors' counsel did not believe "it would . . . be overly detrimental" to the children to be adopted by maternal aunt, noting mother essentially would become the children's legal aunt. Counsel argued the court should terminate parents' parental rights as parents had not met their burden to establish the exception.

Counsel for DCFS also argued that, assuming arguendo mother met the second prong of the exception, she didn't "believe there's any way that the court can find" mother "can meet the third prong that terminating that attachment would be detrimental to the child when balanced against the benefit [of] the new adoptive home."

The court noted it had read and considered the documents introduced into evidence, listened to arguments of counsel, and listened to father's testimony. The court found father did not meet the first prong of *Caden C.*—regular visitation—and found the exception did not apply as to him. The court found mother had visited the children consistently, but "the issue is whether [they] would benefit from a continuing relationship with the mother and that's where it fails." The court continued, "I reviewed this file and I'm satisfied that . . . it would not be harmful to sever the relationship between the parents and [these children] as the adoptive home is the best place for [the children]." The court terminated parents' parental rights as to both children and named the caretaker as the prospective adoptive parent. Parents separately appealed.

17

**5.** *Facts relating to ICWA*

The Indian Child Inquiry Attachment (ICWA-010(A)) forms attached to DCFS's initial July 2019 petition indicated a social worker had made an "Indian child inquiry" for the children and they had no known Indian ancestry. The initial detention report also noted mother denied having any Indian ancestry on July 15, 2019. Mother and father also each filed ICWA-020 Parental Notification of Indian Status forms on July 26, 2019. Each checked the box, "I have no Indian ancestry as far as I know."

At the July 26, 2019 detention hearing, the juvenile court confirmed with mother and father that they had no American Indian heritage in their families' backgrounds as far as they knew. The court found it had no reason to know the children were Indian children under ICWA. The court ordered parents to keep DCFS, their attorneys, and the court aware of any new information relating to possible ICWA status.

DCFS's initial jurisdiction/disposition report states mother denied having Indian heritage. She was born in Los Angeles and raised by her mother. The report states father also was born in Los Angeles and denied having Indian heritage. He was raised by his grandmother and great-grandmother.

## DISCUSSION

**1.** *The court did not err in terminating mother's parental rights*

a. *Applicable law and standards of review*

Under section 366.26, once the juvenile court terminates reunification services and determines a dependent child is adoptable—a finding not in dispute here—it must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under one of

18

several statutory exceptions.  (§ 366.26, subd. (c)(1); *Caden C., supra*, 11 Cal.5th at pp. 630–631.)

The beneficial parent relationship exception applies where the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  Our Supreme Court recently clarified the three elements a parent must prove, by a preponderance of the evidence, to establish the exception: (1) the parent's regular visitation and contact with the child; (2) the child's "substantial, positive, emotional attachment to the parent," "the continuation of which would *benefit* the child"; and (3) that the termination of "that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.)

In assessing whether terminating parental rights would be detrimental to the child, the court must perform a "case-specific inquiry," asking, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.]  When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent."  (*Caden C., supra*, 11 Cal.5th at pp. 633–634.)

"A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption."  (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on another ground in

19

*Caden C., supra,* 11 Cal.5th at pp. 637–638, fns. 6–7.) Rather, the parent must show the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

In evaluating the existence of a beneficial parental relationship, courts consider several factors, including "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.) The *Caden C.* court clarified, however, that a parent's failure to make adequate progress with her case plan or "continued struggles" with issues that led to the dependency—standing alone—do not preclude application of the exception. (*Caden C., supra,* 11 Cal.5th at pp. 637–638.)

We review the court's findings as to whether the parent has maintained regular visitation and whether the child would benefit from continuing the parent-child relationship for substantial evidence. (*Caden C., supra,* 11 Cal.5th at pp. 639–640.) In so doing, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " and we will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) Where, as here, a parent contends the court erred in finding she did not meet her burden of proof, we must determine whether "the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave

20

no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4, 1010, fn. 7.)

"[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [her] parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra,* 11 Cal.5th at p. 640.)

b.     *The court did not err in finding the beneficial parent relationship exception did not apply*

As to the first element, the juvenile court found—and counsel for the children and DCFS agreed—mother consistently visited the children on Sundays at the maternal grandmother's home. DCFS does not dispute that finding on appeal.

As to the second and third elements, the juvenile court stated, "the issue is whether this child"—presumably referring to Robert— "would benefit from a continuing relationship with the mother and that's where it fails. . . . I reviewed this file and I'm satisfied that [for] both children . . . it would not be harmful to sever the relationship between the parents and this child as the adoptive home is the best place for this child."

The record demonstrates at least Robert felt a positive emotional attachment to mother.[5] Robert was seven years old

---

[5]     R.H. was situated differently. She was removed from parents' care at only 11 months. She thus had spent more than two thirds of her life out of mother's custody and with maternal aunt. The only evidence in the record of a bond between her and mother was the fact she cried when mother left at the end of her visits. (She would stop crying, however, when mother gave her

when removed from parents' custody.  He thus had lived most of his life with mother even after having spent two and a half years living with maternal aunt by the time of the section 366.26 hearing.  He referred to mother as "mom."  He considered his relationship with mother to be better than that with father.  He confirmed he saw "his mom" every Sunday at "his nanny's house" and described his interactions with mother there positively:  he "really enjoy[ed] being able to hug his mom" during their visits; they ate, played, and watched television; and "sometimes they walk[ed] to the park."  During her interview, mother said she played card games with the children during her visits and sometimes brought the children toys and food.  When asked whether mother phoned him, Robert said he sometimes would ask "his auntie" to call mother.  He also said he "would actually like to visit mom more."

When the social worker spoke with Robert in September 2022 about his feelings toward adoption, he was a couple of months shy of ten years old.  At first, he said he wasn't sure if he wanted to be adopted.  He knew that adoption meant he would not be "part of his mom anymore."  When asked, he also didn't know that he wanted to return to parents' care.  But, when specifically asked if he wanted maternal aunt to adopt him, Robert said, " 'Yes . . . as long as I can still have visits with my mom and dad.' "  He told the social worker "he would be very

money.)  We assume DCFS would recommend the siblings be treated the same, so that if the beneficial parent exception applied only to one of them, DCFS would recommend legal guardianship for both children.  Accordingly, we focus—as the parties do—on Robert.

upset if he did not see his mom because he enjoys hugging her a lot and has a good relationship with [her]."

The record does not include any observations by the social worker of mother's visits with her children. Although the record indicates the social worker visited the children in their placement, it is unclear whether a social worker ever was present at one of mother's visits with them at maternal grandmother's home. Accordingly, only the social worker's notes and DCFS reports of what the participants told the social worker about the visits were before the juvenile court. We conclude Robert's own statements reflect he had a substantial, positive, emotional attachment to mother. Although the court did not explicitly rule mother satisfied the second element of the exception, we assume it found she did.

Mother argues the juvenile court failed to consider the evidence of an emotional bond between Robert and mother and ignored Robert's expressed wishes. She thus contends the court did not engage in the analysis of the detriment to the child should that "substantial, positive relationship be severed" necessary to the balancing test required under *Caden C*. We disagree. We do not read the court's ruling as finding Robert did *not* have an emotional attachment to mother, as she suggests. Rather, we read the court's ruling to reflect its finding that *on balance* the security and stability of adoption outweighed any harm to the children from the loss of their parent-child relationship with mother so that terminating parental rights would not be detrimental to them.

First, as DCFS notes, the juvenile court was not required to recite its specific factual findings in determining the beneficial parent relationship exception to adoption did not apply. (*In re*

23

*A.L.*, *supra*, 73 Cal.App.5th at pp. 1155–1156.)  Second, the court here was well versed in our high court's directives in *Caden C.* and specifically referred to the case and its requirements throughout the proceedings.  Indeed, the court admonished DCFS to ensure its reports complied with *Caden C.*  Responding to minor's counsel's objection in May 2022 that the section 366.26 report did not provide sufficient information about the visits between parents and the children, the court stated, "I know that [DCFS] was given a tutorial on *Caden C.*[,] but it doesn't seem to have trickled down to some of these social workers who are writing these reports.  I won't accept these reports.  I need the information that is necessary for an appropriate finding at a .26."  Ultimately, the court ordered DCFS to provide a supplemental report on visitation that included "interviews of the parents, caregivers[,] and the child Robert."  In response, DCFS filed the September 30, 2022 LMI that included Robert's statements.  Accordingly, we can infer the court understood what it must and must not consider in assessing the beneficial parent relationship exception.

Moreover, the court stated it had read *and considered* the evidence before it—which included DCFS's reports—and the arguments of counsel.  DCFS's LMI included Robert's statements about being "very upset" if he didn't see his mother, and his desire to be adopted by maternal aunt if he could continue seeing his parents.  Mother's counsel specifically argued Robert's statements were "clearly telling us" he did not want adoption as it would sever his relationship with parents.

We thus can infer the court considered Robert's wish to see his mother, and the other evidence before it, in finding termination of parental rights would not be detrimental to him

24

when balanced with the benefits of adoption. As the court stated in *In re C.B.* (2010) 190 Cal.App.4th 102, 125, "[w]hile the court had to consider each child's wishes, it was required to act in each child's best interest (§ 366.26, subd. (h)(1)) and a child's wishes are not necessarily determinative of the child's best interest." The record here supports the juvenile court's implied finding that the benefits of stability, security, and permanence Robert would receive through adoption were in his best interest and outweighed the upset he would experience from the loss of his relationship with mother.

The record shows that, for the two and a half years Robert had been living with maternal aunt, his relationship with mother was limited to monitored visits once a week at his grandmother's home or a nearby park. Although Robert enjoyed those visits and his hugs with mother, the record does not indicate mother asked Robert about his schooling, his well-being, or his feelings. Rather, mother's visits with the children—by her own account—consisted of playing games, watching television, and going to the park. She sometimes brought the children food and toys. According to maternal aunt, mother "usually" watched television with the children or gave them her cellphone. Mother also wouldn't bring anything to the park to play with the children and would "just sit there and . . . not engage with her children." The court reasonably could find mother was not particularly engaged with her children during their visits.

We acknowledge "[t]he quality of the minor's attachment to his parents must be evaluated in the context of the contact they were permitted to have with him during the course of the dependency proceeding." (*In re M.G.* (2022) 80 Cal.App.5th 836, 851.) Critically, here, the record shows mother was scheduled

to visit with the children *twice per* week—once at maternal grandmother's home and once at maternal aunt's home—but mother chose not to.[6] Robert wished he could see mother more often, but mother never made the effort to take the bus to visit the children at maternal aunt's home despite maternal aunt's invitation. In September 2022, maternal aunt confirmed with the new social worker that mother visited the children only when maternal aunt drove them to maternal grandmother's home.[7] And, during the two and a half years the children were out of her custody, mother never once asked DCFS to liberalize her visits to unmonitored—despite their authority to do so—or what she would need to accomplish to be granted an unmonitored visit.

The DCFS reports also show the caretaker described mother as having "little to no" patience with the children and said mother got "easily frustrated with them" as late as June 2022. In her September 2022 interview, maternal aunt told the social worker mother never called to check on the children's

---

[6] The court's original disposition order from August 2020 ordered monitored visits for mother "at least twice a week for two hours in duration" and gave DCFS discretion to liberalize. DCFS's reports repeatedly stated mother was scheduled to visit the children twice per week, once at maternal grandmother's home and once at the caregiver's home.

[7] The new social worker asked mother why she didn't visit on *Saturdays.* Mother responded she didn't know that was an option. The record shows, however, that mother's second visit was scheduled for a *weekday* at maternal aunt's home. In September 2022, maternal aunt confirmed the previous social worker had "set up" mother to visit once during the week, but mother never did.

well-being, only to confirm her Sunday visit.  Nor, as minors' counsel noted, is there any evidence in the record that mother attended any of the children's medical or school appointments—or asked to attend them—despite Robert's struggles with asthma and earlier issues with school.  Rather, when mother said she would like to be more involved in decision making concerning the children, she cited "parties" as an example.  And, mother did not appear at the section 366.26 hearing, like father did, to testify about her interactions with the children during their visits or to explain why she didn't travel to maternal aunt's for a second visit with her children during the week.[8]

Robert wanted to see mother but also consistently said he wanted to stay with his aunt.  He and R.H. referred to maternal aunt and her wife interchangeably as "aunt" and "mom."  Both children were thriving in their caregivers' home—Robert's asthma was under control and he was doing better in school.  Maternal aunt and her spouse were committed to adopting the children to provide them with "a nurturing and stable home."

Other than Robert's statement that he would be upset if he could not see mother, mother presented no evidence showing that terminating the parent-child relationship would harm the children or that any harm would not be outweighed by the security and stability adoption would provide.  As we said, mother did not appear at the section 366.26 hearing; her counsel gave no reason for her absence.  Notably, Robert's and R.H.'s counsel—although acknowledging mother had "a beneficial

_____

[8]    Mother said she had a learning disability.  Nothing in the record, however, suggests mother was incapable of taking a bus.  She also told the social worker she graduated from high school.

27

relationship with the children"—argued the court should terminate parental rights as that relationship did "not meet the threshold needed to outweigh the benefits of adoption."

Despite Robert's obvious desire to see his mother, on this record we do not find the court abused its discretion in finding the benefits of adoption outweighed any harm to Robert if his relationship with mother were severed. Robert had conflicting feelings. He didn't understand why "this [was] happening to him." He wanted to be able to see and hug mother, but he also wanted maternal aunt to adopt him. The juvenile court reasonably could have found the stability, security, and permanence of adoption would benefit Robert in light of these conflicting feelings. And, given the limited nature of mother's relationship and engagement with Robert (and R.H.)—partly through her own choice—we cannot conclude the court abused its discretion in finding those benefits of adoption outweighed the upset Robert might experience from the termination of his parent-child relationship with mother.

Finally, we do not agree with mother's interpretation of the court's statement that, "it would not be harmful to sever the relationship between the parents and this child as the adoptive home is the best place for this child," as having improperly "focused on . . . the appropriateness of the adoptive placement." As we said, the court referred to *Caden C.* throughout the proceedings. Our high court's directives were foremost in the court's mind. Mother's counsel also noted an adoptive parent's willingness to allow parents to maintain contact with their child is an improper consideration at a section 366.26 hearing, citing *In re C.B.*, *supra*, 190 Cal.App.4th at pp. 127–129 (remanding for new section 366.26 hearing where juvenile court reached

its conclusion that the termination of parental rights would not " ' "greatly harm" ' " the children based in part on the expectation that aunt and uncle caregivers would permit children to have continued contact with their mother).

Maternal aunt here said she was willing to have an open adoption, and mother understood her sister would allow her to have contact with the children. Nothing in the record suggests, however, the court impermissibly considered that fact, as in *In re C.B.*, in finding severing the mother-child relationship would not be detrimental to the children when balanced with the benefits they would gain from adoption. We are convinced the juvenile court considered the evidence before it and adhered to our high court's ruling in *Caden C.* (See *In re A.L., supra*, 73 Cal.App.5th at p. 1156 [rejecting parent's claim court "simply considered the respective parental roles of the foster parents" and parent and failed to engage in balancing test, citing *People v. Thomas* (2011) 52 Cal.4th 336, 361 for the proposition that "appellate court 'presume[s] that the [trial] court "knows and applies the correct statutory and case law" ' "]; cf. *In re J.D.* (2021) 70 Cal.App.5th 833, 863–864 [remanding for a new section 366.26 hearing where neither the parties nor the court had the benefit of *Caden C.*, and reviewing court could not be certain juvenile court did not rely on improper factors].)

The evidence here shows Robert got some benefit from seeing mother—especially being able to hug her—but the evidence does not compel a finding that Robert's relationship with mother was so significant that its loss would be detrimental to him. In so concluding, we do not discount Robert's statements about his feelings toward mother. We recognize, as we infer the juvenile court did, Robert will face some upset. We cannot say

the juvenile court acted outside the bounds of reason in finding that upset did not outweigh the benefits of adoption, however. Accordingly, we conclude mother and father failed to demonstrate the juvenile court prejudicially erred in terminating their parental rights.

### 2. *We remand for compliance with ICWA*

Both the juvenile court and DCFS "have an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child." (§224.2, subd. (a).) Under section 224.2, subdivision (b), if a child is placed in DCFS's temporary custody, the agency must inquire whether the child is or may be an Indian child, by asking a nonexclusive group that includes the child, the parents, and extended family members. Parents denied the children were Indian children, but the record does not indicate DCFS asked the children's extended family members about their possible Indian status. Extended family members include grandparents, aunts and uncles, siblings, sibling-in-laws, nieces, nephews, first or second cousins, and stepparents. (25 U.S.C. § 1903(2); § 224.1, subd. (c).) DCFS does not oppose a remand "for the purpose of making ICWA inquiry of known and available extended family members." We accept DCFS's concession and conditionally affirm the matter for DCFS to do so.

### DISPOSITION

The juvenile court's orders terminating parental rights are conditionally affirmed. We remand the case for further proceedings (1) to ensure DCFS has made an ICWA inquiry of the children's known and available extended family members; and (2) for the juvenile court to determine whether ICWA applies based on that inquiry. If the court determines it has no reason to believe ICWA applies, the orders terminating parental rights

30

shall remain in effect.  If DCFS's inquiry gives the court a reason to believe ICWA applies, the court shall vacate those orders and conduct further proceedings consistent with ICWA and related state law.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

HEIDEL, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.